EXHIBIT 1

IN THE DISTRICT COURT OF BEAVER COUNTY, OKLAHOMA

BEAVER COUNTY OKLAHOMA
**FILED**

AUG 09 2016

TAMMIE PATZKOWSKY
COURT CLERK
BY_____ DEPUTY

Bill G. Nichols,
on behalf of himself and all others
similarly situated,

        Plaintiff,

v.

Chesapeake Operating, LLC, and Chesapeake
Exploration, LLC

        Defendants.

Case No. CJ- 2016-14

## CLASS ACTION PETITION

Plaintiff, on behalf of itself and the Class of all other persons similarly situated, brings

these claims against Defendants, and in support of these claims states as follows:

### NATURE OF THE ACTION

1.     Plaintiff and the Class bring claims based upon Defendants' underpayment or

non-payment of royalties on natural gas and/or constituents of the gas stream produced from

wells through improper accounting methods (such as not paying on the starting price for gas

products but instead taking improper deductions) and by failing to account for and pay royalties,

all as more fully described below.

### VENUE AND JURISDICTION

2.     Bill G. Nichols is a resident and citizen of Beaver, Oklahoma and a royalty owner

in Oklahoma wells owned in part or operated by Defendants.

3.     This Court has jurisdiction over Defendants in that their wrongful acts occurred

and caused damages to Class members in this County.

4.     Venue is proper in this Court for one or more of the following reasons: (i)

Plaintiff and other Class members reside in this County; and (ii) Defendants do substantial continuous business in this County.

5.       Although Defendants know how much has been deducted (or allowed others by contract to deduct) in whole or in part from valuable gas constituents from wells, Plaintiff does not have access to that information yet, but individually, Plaintiff does not claim damages, including punitive damages, that will be in excess of $75,000.

6.       The Oklahoma Resident Class defined below are all Oklahoma citizens, so all of the proposed Class members are Oklahoma citizens. Because Defendants are Oklahoma citizens, there is no diversity of citizenship.

## PARTIES

7.       Plaintiff has a royalty interests in the Venable 1-34 well in Beaver County, Oklahoma, which is subject to OCC Spacing Unit Order 217783. Defendants owns a working interest in and pay royalty to Plaintiff on this well.

8.       Defendants Chesapeake:

a.   Chesapeake Operating, LLC (f/k/a Chesapeake Operating, Inc.) is an Oklahoma limited liability company, with its principal place of business in Oklahoma City, Oklahoma, and its sole member Chesapeake Energy corporation. Chesapeake Operating, LLC is the agent for Chesapeake Exploration, LLC. Chesapeake Operating, LLC can be served by serving The Corporation Company, Inc., 1833 S. Morgan Road, Oklahoma City, OK 73128.

b.   Chesapeake Exploration, L.L.C. is a limited liability company organized under Oklahoma law, and is made up of three members, Chesapeake Operating, L.L.C., Chesapeake E&P Holding Corporation, and Chesapeake Appalachia, L.L.C. Chesapeake E&P Holding Corp. is a corporation organized under Oklahoma law with its principal place of business in Oklahoma.

2

Chesapeake Appalachia, L.L.C. is a limited liability company with Chesapeake Energy

Corporation as its sole member. Chesapeake Energy Corporation is a corporation organized

under Oklahoma law with its principal place of business in Oklahoma. Chesapeake Exploration,

LLC can be served by serving The Corporation Company, Inc., 1833 S. Morgan Road,

Oklahoma City, OK 73128.

9.     Defendants are in the business of producing, operating, and/or marketing gas and

constituent products from the wells in which Class members hold royalty interests.

10.     The usual royalty payment is between $1/8^{th}$ and $3/16^{th}$ of a well's revenue.

11.     Defendants and their affiliated successors, and current and past employees,

agents, representatives, attorneys, or others acting on their behalf shall herein collectively be

known as "Defendants" or "Chesapeake".

12.     The acts charged in this Petition as having been done by Defendants were

authorized, ordered, or done by officers, agents, affiliates, employees, or representatives, while

actively engaged in the conduct or management of Defendants' business or affairs, and within

the scope of their employment or agency with Defendants.

## CLASS ACTION ALLEGATIONS

13.     Plaintiff brings this action individually and as representative of a (b)(3) class

defined as follows:

> All persons who are (a) an "*Oklahoma Resident*"; and, (b) a royalty owner in
> Oklahoma wells where Chesapeake Operating, LLC (f/k/a Chesapeake Operating,
> Inc.) and/or Chesapeake Exploration, LLC is or was the operator (or a working
> interest owner who marketed its share of gas and directly paid royalties to the
> royalty owners) from January 1, 2015 to the date Class Notice is given. The Class
> claims relate to royalty payments for gas and its constituents (such as residue gas,
> natural gas liquids, helium, nitrogen, or drip condensate).

> Excluded from the Class are: (1) agencies, departments or instrumentalities of the
> United States of America, including but not limited to the U.S. Department of the

Interior (the United States, Indian tribes, and Indian allottees); (2) Defendants, their affiliates, predecessors, and employees, officers, and directors; (3) Any NYSE or NASDAQ listed company (and its subsidiaries or affiliates) engaged in oil and gas exploration, gathering, processing, or marketing; (4) the claims of royalty owners to the extent covered by arbitration clauses or prior settlement agreements, if any, still in effect on or after January 1, 2015; (5) overriding royalty owners and others whose interest was carved out from the lessee's interest; (6) royalty owners who opted out or objected of record in *Fitzgerald Farms, LLC v. Chesapeake Operating, Inc.*, Case No. CJ-10-38, Beaver County, Oklahoma; (7) royalty owners who have already filed and still have pending lawsuits for underpayment of royalties against Chesapeake at the time suit is filed herein; (8) royalty owners taking gas in-kind, if any.

*"Oklahoma Resident"* means: Persons to whom, from January 1, 2015 to the date suit was filed herein, (a) Chesapeake mailed or sent each monthly royalty check on an Oklahoma well to an Oklahoma address (including direct deposit); (b) Chesapeake mailed or sent a 1099 for both 2014 and 2015 to an Oklahoma address; (c) the Settlement Administrator in *Fitzgerald Farms, LLC v. Chesapeake Operating, Inc.*, Case No. CJ-10-38, Beaver County, Oklahoma mailed or sent a distribution check and 1099 to an Oklahoma address; and, (d) except for charitable institutions, were *not* subject to the Oklahoma Withholding Tax for Nonresidents on royalties paid in 2014 to the date suit was filed.

14.     The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. For instance, Defendants have operated over a 1000 Class Wells producing gas in which they hold a working interest, with at least one, and usually more, royalty owners for each well. The royalty owners in this Oklahoma Resident Class are citizens of Oklahoma, but reside throughout the state. Defendants has within their possession or control records that identify all persons to whom they (including affiliated predecessors and those for whom they are legally responsible) have paid royalties from Class Wells during the Class Period.

15.     The questions of fact or law common to Plaintiff and the Class include, without limitation, one or more of the following:

(a)     Whether the Plaintiff and members of the Class are beneficiaries of the implied Marketable Condition Rule (MCR) which requires Defendants to do more than sever the gas from the ground, but also at their sole expense, to prepare the gas for market?

4

(1) If so, whether the Midstream Costs of gathering, compression, dehydration, treatment, and processing (GCDTP) are costs associated with preparing the gas for market such that none of them should have been deducted from royalties but all of them were or whether the market for gas occurs before they are incurred such that the Class only has a claim for excessive deductions of Midstream Costs?

(2) If not, whether the Class members were party to an Express Deduction (ED) Lease which expressly allows deduction of all of the GCDTP Midstream Costs, such that they only have a claim for excessive deductions of Midstream Costs, so whether the Midstream Costs which were deducted were excessive in amount?

(b)     Whether Plaintiff and members of the Class got paid for all valuable constituents that came from their wells and benefited Defendants either through payment or by contractual consideration in-kind to a Midstream company (such as drip condensate, helium, liquefied nitrogen, some percentage of residue, some percentage of fractionated NGLs, plant fuel, or FL&U)?

(c)     Whether Defendants (including any of their affiliates) paid royalty to Plaintiff and the Class members based on a starting price below what Defendants or their affiliates received in arm's-length sales transactions?

16.     Plaintiff is typical of other class members because Defendants pay royalty to Plaintiff and other class members using a common method. Defendants pay royalty based on the net revenue Defendants receive under their gas contracts. The gas contract terms are unknown to and unapproved by royalty owners. The contracts are for services necessary to place the gas and its constituent parts into marketable condition (such that they can reach a real market for a good faith sale).

17.     Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is a royalty owner paid by Defendants, and understands his duties as a Class representative. Plaintiff has retained counsel competent and experienced in class action and royalty owner litigation.

18.     This action is properly maintainable as a class action. Common questions of law *or* fact exist as to all members of the Class and those common questions predominate over any

questions solely affecting individual members of such Class. *See* ¶ 15 above. There is no need for individual Class members to testify in order to establish Defendants' liability or damages to the Class.

19.     Class action treatment is appropriate in this matter and is superior to the alternative of numerous individual lawsuits by members of the Class. Class action treatment will allow a large number of similarly situated individuals to prosecute their common claims in a single forum, simultaneously, efficiently, and without duplication of time, expense and effort on the part of those individuals, witnesses, the courts and/or Defendants. Likewise, class action treatment will avoid the possibility of inconsistent and/or varying results in this matter arising out of the same facts. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action and no superior alternative forum exists for the fair and efficient adjudication of the claims of all Class members.

20.     Class action treatment in this matter is further superior to the alternative of numerous individual lawsuits by the members of the Class because joinder of all members of those Class would be either highly impracticable or impossible and because the amounts at stake for individual Class members, while significant in the aggregate, are not great enough to enable them to enlist the assistance of competent legal counsel to pursue their claims individually. In the absence of a class action in this matter, Defendants will likely retain the benefit of their wrongdoing.

## GAS INDUSTRY BACKGROUND

21.     The members of the Plaintiff Class own interests in wells that produce gas and constituent products that are subject to uniform accounting methods and implied marketable

product law which requires the lessee to bear all of the costs of placing the products, whether gas or its constituent parts, in "Marketable Condition".

22.     The lessee under an oil and gas lease has the duty to produce marketable products, and the lessee alone bears the expense in making all products marketable. Gas and its constituent parts are marketable only when in the physical condition to be bought and sold in a commercial marketplace.

23.     Only after a given product is marketable does a royalty owner have to pay his proportionate share of the reasonable costs to get a higher enhanced value or price for that particular product.

### The Lessor-Lessee Relationship

24.     The lessor owns minerals, including oil and gas, and the lessee has the money, labor, and know-how to extract, condition, and market those minerals. The lessor and lessee enter into a lease that allows the lessee to take the minerals from the lessor's land. The usual revenue split from a well was 1/8th to the lessor (royalty owner) and 7/8ths to the lessee. As the risk of finding oil and gas has diminished over time, due to the prevalence of wells delineating the field, better seismic technology to find oil and gas, and drilling rigs becoming more efficient, royalty owners on more recent leases have received 3/16th or even 1/4th of the revenue. The oil and gas companies through undisclosed internal accounting practices have tried to keep as much of the well revenue as possible. These accounting practices are at the heart of every oil and gas royalty owner case.

25.     Rather than adopting transparency in their royalty calculation formula, Defendants, like most lessees, have guarded their production and accounting processes as confidential or proprietary, thereby, depriving the royalty owners of critical information.

Consequently, the royalty owner is unaware of the lessee's actual practices which enable the lessee to breach the oil and gas lease without accountability.

26.     If after years one or more of the royalty owners learn of the "breach", the royalty owner has only 3—all poor—options: (1) confront the lessee and maybe get paid while the lessee continues to retain improperly garnered gas revenues from thousands of other unknowing royalty owners; (2) do nothing since the deductions result in only a modest yearly loss and individual litigation is too expensive to pursue for that; or (3) file a class action lawsuit which will last for years and probably will not recover the full loss. In short, if lessee breaches, it may never be held accountable, and if a royalty owner complains, the lessee will still come out ahead because an individual case is not worth much and a class action rarely requires 100% repayment to royalty owners plus pre-judgment interest, plus attorneys' fees and expenses. The class action is the best of the options, hence this suit.

### Residue Gas, Helium, Nitrogen and Natural Gas Liquids Production

27.     The gas is gathered from each well, dehydrated and compressed, through gathering lines that are buried underground and cross many miles of land. The two primary raw gas products, methane and fractionated natural gas liquids ("NGLs"), are further processed at processing plants before being piped to the commercial market and then on to the end-user.

### Wellhead (Basic Separation and Gas Measurement)

28.     The diagram below illustrates the gas conditioning process.



Wells produce oil, gas, and a host of other products, such as water, helium, nitrogen, etc., all

mixed together in the gas stream.[1] After the stream comes out of the ground, it enters the free

water knockout (a/k/a three-phase separator) which separates the products by gravity, water at

the bottom, oil in the middle, and gas going out the top. Due to the low technology, the separator

is not expensive (the "separation cost"). The gaseous mixture (with helium, nitrogen, NGLs, and

other gaseous substances) passes from the separator into the gas line.[2] The remaining fluid goes

through the heater-treater where heat, gravity segregation, chemical additives and electric current

---

[1]     Hydrocarbons can vary in chemical makeup (from simple methane to complex octane) and in form (from a pure gaseous state to liquid condensate). The non-hydrocarbon makeup of the well-stream that includes natural gas can also include gases such as helium, sulfur, carbon dioxide, and nitrogen. This mixture of many gaseous elements and substances is often referred to as the "gas stream" or just "gas".

[2]     A minute portion of this raw gas may be used on a few leased lands to heat the farm house pursuant to a free gas clause in the lease. Although title transfers to the gas, it is not a sale. Some producers sell less than 3% of their gas to a local irrigator during the summer months, but this is not the market for which the wells are drilled.

break down the mixture more clearly into oil and water. The heater-treater is installed,

maintained and takes fuel to operate (the "heater-treater cost"). The water is drained off and sent

for salt water disposal. The oil that is separated at the wellhead is collected in a tank, usually

trucked out and sold. [The payment of oil royalties is not at issue in this lawsuit.]

29.      Since the pressure of wells is depleted over time, sometimes on-lease compressors

have been installed to suction gas out of the well or just to move the gaseous mixture, but they

are rare. These on-lease compressors are installed, maintained, and use fuel (the "on-lease

compression" or "vacuum compression" cost). The gaseous mixture produced from a single well

cannot be processed economically, so the mixtures are 'gathered' together through gathering

lines and the aggregate mixture is put through a processing plant. *See*

http://www.kgs.ku.edu/Publications/Oil/primer13.html



**Gathering Lines (Dehydration, Compression, Condensate)**

30.      As the gaseous mixture from each well enters the gathering line it is measured, in

both volume (in Mcf) and quality (Btu content) (combined, "gas measurement," in MMBtu).

This is done in a meter run, which must be constantly maintained to preserve accuracy. Gathering

pipelines are usually made of metal that could be corroded by any remaining water vapor (and

other corrosive gases) in the gaseous mixture, so a glycol dehydrator is used to remove the water

vapor. Of course, gas cannot move unless it is pressurized, so large gas compressors are installed

to move the gas down the gathering line. The gas must be pressurized at a high enough level to

overcome the back-pressure in the line and friction. These compressors are expensive and require

fuel to operate. The gathering pipelines themselves cost money to lay and maintain, though most

have been in place for decades. Gas condensate (gas condensed into liquid as it cools and is

pressurized) ("Drip Condensate") is collected at points along the gathering lines as a result of

cleaning or "pigging the line" and is captured for fractionation later. Finally, gathering lines leak,

especially as they age, resulting in lost and unaccounted for gas ("L&U").

## Natural Gas Processing

31.     Once the gas mixture is gathered from a sufficient number of wells (and often

from multiple gathering systems), it enters the inlet of the processing plant. To process the gas

into methane and mixed NGLs, lessees, such as Defendants, use gas processing plants. The

processing plant is usually owned by an unrelated third party, but may be owned in whole or in

part by lessees. Sometimes other impurities in the mixture must be removed such as carbon

dioxide, nitrogen, or sulfur (the "treatment cost"). Methane gas (also called "residue gas") must

meet the quality standards for long-haul pipeline transmission set by the Federal Energy

Regulatory Commission (FERC) which is called "pipeline quality gas". NGLs are used as a

feedstock in the petrochemical and oil refining industries, and are worth more than methane.

NGLs are separated from the gaseous mixture by cooling the mixture until the NGLs become

separated. This cooling or Cryogenic recovery method usually takes place at temperatures lower

than minus 150°F (the "Cryogenic or cooling process"). The mixture of NGLs is further moved

down a liquids pipeline and processed by a fractionator for separation of the NGLs into their

component parts ("T&F" or "fractionation"). Helium is processed at the processing plant into

Grade A helium at newer processing plants, and to a crude helium level contaminated with

nitrogen at older plants that then have a companion helium processor nearby (often a few

hundred feet away) to finish the processing into Grade A helium for commercial sale and use.

This total processing system involves expensive equipment and requires fuel to operate

(collectively, the "processing charge" and/or "plant fuel").

   32. At the tailgate of the processing plant, at least two products emerge: (1) residue

gas (or methane gas); and, (3) NGLs (usually a mixture of NGLs, known as "raw make" or "Y"

grade). In helium rich production areas, Grade A or crude helium, along with liquefied nitrogen

also emerges. But none of these products are commercially marketable at that point.

**Marketable Condition for the Products**

   33. *Methane Gas.* Methane gas (or residue gas) is commercial quality (a/k/a "pipeline

quality") at the tailgate of the processing plant only after it is further pressurized to enter the

transmission line by a booster compressor (the "booster compression" cost).

   34. *NGLs.* The raw mixture of NGLs at the tailgate of the processing plant is not

commercially marketable. It must be fractionated into commercially marketable products—

ethane, propane, butane, isobutane, natural gasoline, etc. *See*,

http://ngl.conocophillips.com/news/about.htm. Defendants improperly deduct, in computing

royalty for NGLs, processing fees and/or other costs (such as transportation and fractionation,

T&F) needed to reach commercially marketable fractionated NGLs.

   35. *Drip Condensate.* Drip Condensate is recovered on the gathering lines and at the

inlet to the processing plant, and is essentially in marketable condition when collected.

   36. *Other Products.* In some areas of the country (Hugoton Field and Wyoming),

helium is produced in commercial quantities and recovered, along with liquefied nitrogen. Other

areas of the country produces sulfur and carbon dioxide in commercial quantities. When such products are available in commercial quantities, processing and treatment plants recover those valuable constituents and royalty owners should be paid for them.

### Sale of Products

37. To turn the gas products into money, the producer must prepare them for market and sell them in the commercial market place in an arm's length transaction. That, in fact, occurs, but lessees attempt to cover up and manipulate that fact by self-serving language in gas marketing contracts about title transfers or even by creating wholly owned affiliates to manufacture a fictitious "sale" before the gas reaches commercial quality for sale.

38. The "starting price" for gas products is always achieved, as it must be, at a commercial market price. All of the gas contracts require a commercial market price expressed in one of two ways: (a) a market price, called an "Index" price for residue gas and "OPIS" price for fractionated NGLs, or (b) a "weighted average sales price (WASP)" achieved at the same residue Index market or OPIS market, with the difference being that Defendants have the market power to, over time, obtain above "Index" or "OPIS" price in an arm's length sale. Whichever starting price is used in an arm's length transaction is the highest and best reasonable price for the valuable gas products. If Other Products are also produced, they are and must be also priced in a commercial market.

39. Affiliate gas contracts are not arm's length sales in a commercial market; instead, the sale by the affiliate in the commercial market in an arm's length sale is the true sale that should be used as the "starting price" for marketable condition gas products.

(a) Some lessees contract with affiliated gathering companies or other affiliated gas service providers before the products (residue gas and/or NGLs) are in Marketable Condition

13

in an effort to: (1) artificially, and improperly, create a commercial market where none truly exists in order to justify deducting costs from, or not even paying for, the gas or constituent products to royalty owners; (2) charge "marketing fees" to royalty owners through affiliates even though the lessee is already obligated under the lease to prepare the gas for market and market the gas and constituent products; and/or (3) pay on the lower lessee/affiliate sale price not the higher affiliate/third party price. Chesapeake Energy Marketing, Inc. (CEMI) is such as entity and was used for years to skim marketing fees off of the starting price for gas products before paying royalties. It is believed that Defendants stopped this improper practice before the Class Period in this case.

(b) WASP involves a pool of sales transactions to third parties (and/or affiliates) and combines the prices paid by those third parties (and/or affiliates) to arrive at a "weighted average sales price". Lessees can manipulate this process by using lower lessee/affiliate sales prices for part of the pool price, rather than all third party arm's length sale prices. It is believed that Defendants do not use this improper tactic to lower the starting price paid to royalty owners.

40.     Fictitious "sales" are created by lessees in an effort to pass off a non-commercial market sale as if it should be the starting point for royalty payments, but none of those efforts comport with economic reality or are in good faith with respect to royalty owners, for instance:

(a)   Anything of value can be sold anyplace in any condition. Gas and other minerals can and are routinely sold in the ground, but they are not in marketable condition. Gas could be sold at the bottom of the hole when it is severed from the surrounding rock and enters the downhole pipe, and, even though a contract driller might be willing to accept some percentage of the future sale of oil or gas in the real marketplace as compensation for his drilling services, that does not make such a sale to be a real market sale. Gas

14

could be sold "at the wellhead" when the gas is severed from the surface, and even though a contract operator might be willing to accept some percentage of the future sale of oil or gas in the real marketplace as compensation for his well operating services, that does not make such a sale to be a real market sale. Gas also could be sold at the gathering line inlet when the gas changes custody into a gathering line, and even though a contract gatherer might be willing to accept some percentage of the future sale of gas in the real marketplace as compensation for his gathering services, that does not make such a sale to be a real market sale. Gas also could be sold at the processing plant inlet when the gas changes custody into the processing plant, and even though a contract processor might be willing to accept some percentage of the future sale of gas in the real marketplace as compensation for his processing services, that does not make such a sale to be a real market sale. All of these services could be paid for in monetary fees, or in-kind contribution of all or part of the valuable constituents, but they are all just services necessary to prepare the gas and valuable constituents for the first real commercial market—Index and OPIS.

(b)   Paper title transfer at a custody transfer point does not create a real commercial market. Some gas contract with Midstream companies that provide Gathering, Compression, Dehydration, Treatment, and Processing ("GCDTP" or "Midstream") services purport to do that, but other parts of the gas contract demonstrate that it is a legal sleight of hand as (i) the risk of loss that usually passes with a true title transfer and market sale does not happen; (ii) the cost of future downstream services that usually passes with a true title transfer and market sale does not happen; (iii) the starting price which would occur with a true title transfer and market sale does not happen.

Indeed, the paper title transfer is unnecessary to receiving the Midstream services as the gas could receive the exact same Midstream services without the paper title transfer.

(c) All of the gas contracts implicitly recognize this paper title transfer fiction, as the starting price for gas products always is at the Index and OPIS market pool as previously described.

(d) Midstream service providers are not buyers and resellers of raw gas, they are service providers to covert raw gas into pipeline quality gas so it can enter the Index or OPIS market pools.

### Different Ways Defendants Underpay Royalty Owners

41.      The extraordinarily large dollars at stake and the one-sided nature of the gas lessor-lessee relationship are constant temptations to lessees to wrongfully retain gas revenues. All payment formulas, affiliate and non-affiliate contractual relationships, and all calculations are exclusively in the control of lessees, *and* they involve undisclosed accounting and operational practices. As a result, there are many ways royalty owners are underpaid on their royalty interests, and they never know it. The common thread through all of these schemes is that they are typically buried in the internal lessee accounting systems or royalty-payment formulas.

42.      Defendants represent the royalty calculation on the form of a monthly check stub sent to each royalty owner. The check stub shows each royalty owner's interest and taxes (which are not in dispute here), and volume, price, deductions, and value, all of which are disputed.

43.      Defendants underpay Plaintiff and the other Class Members in the following ways for royalty owners that are not bound by an Express Deduction Lease in a Marketable Condition Rule state:

(a)     Residue Gas. The starting price paid for residue gas should be an arm's length, third party market sales price for residue gas at pipeline quality, and it is under all of Defendants' gas contracts. But instead of paying on that gross competitive price, Defendants pay on a net price after directly taking or allowing midstream companies to indirectly take Midstream Service deductions (both monetary fees and in-kind volumetric deductions).

(b)     Natural Gas Liquids (NGLs). The starting price paid for fractionated NGLs should be an arm's length, third party market sales price for ethane, propane, normal butane, iso-butane, and pentane plus (a/k/a natural gasoline), and it is under all of Defendants' gas contracts. But instead of paying on that gross competitive price, Defendants pay royalty for (i) only some of the NGLs produced (some is lost and unaccounted for in the gathering process, lost in plant fuel or compression fuel); (ii) deducts processing fees and expenses (often keeping in-kind a Percentage of the Proceeds (POP) of the fractionated NGLs as payment for the processing services); and, (iii) and reduces payment by T&F.

(c)     Drip Condensate. Plaintiffs and Class Members' wells produce heavy hydrocarbons that condense in the pipeline and are recovered by Defendants (or on behalf of Defendants by their gatherers and/or processors), but Defendants fail to pay any royalty for that Drip Condensate.

(d)     Other Products. Helium is contained in the well-stream produced from Plaintiff's and many Class members' wells, but Defendants: (i) fail to pay royalty for all of the helium produced (some is lost and unaccounted for in the gathering and processing process); (ii) deduct processing fees and costs even though the helium is not yet in commercial grade; and (iii) pay at a lower than commercial Grade A price. Often times, Defendants do not pay at all for Helium, for liquid nitrogen, or other products, but Defendants always underpay for the Helium

17

that is recovered.

44. Defendants underpay all other Class Members, from whom Defendants are legally entitled to deduct post-production Midstream service costs, by taking excessive deductions by entering into Midstream Service Contracts that allow excessive charges for GCDTP services.

## COUNT I—BREACH OF LEASE

45. Plaintiff and the Class incorporate by this reference the allegations in paragraphs 1- 44, and 50-70.

46. Plaintiff and the other Class Members entered into written, fully executed, oil and gas leases with Defendants, and those leases include implied covenants requiring Defendants to prepare the gas and its constituent parts for market at their sole cost. The leases also place upon Defendants the obligation to properly account for and pay royalty interests to royalty owners under the mutual benefit rule and good faith and fair dealing.

47. At all material times, Plaintiff and the Class have performed their terms and obligations under the leases.

48. Defendants breached the leases, including the implied covenants, by their actions and/or inactions.

49. As a result of Defendants' breaches, Plaintiff and the Class have been damaged through underpayment of the actual amounts due.

## COUNT II—BREACH OF FIDUCIARY DUTY

50. Plaintiff and the other Class Members incorporate by this reference the allegations in paragraphs 1 - 49, and 57 - 70.

51. The Class members have interests in Oklahoma wells that have unitized under 52 O.S. §§ 287.1-287.15 and/or 52 O.S. § 87.1.

52.     A fiduciary duty was created and vested when Defendants (or their predecessor in interest) requested and received unitization orders from the Oklahoma Corporation Commission pursuant to those statutes.

53.     Defendants are the unit operator for Class members.

54.     Defendants breached their fiduciary duty to the Class members by failing to properly report, account for, and distribute gas proceeds to the Class members for their proportionate royalty share of gas production.

55.     As a direct and proximate result of Defendants' conduct in breaching their fiduciary duties, Class members are entitled to recover actual damages.

56.     Plaintiff and the Class are also entitled to and seek pre-judgment interest, post-judgment interest, attorneys' fees from the common fund, expenses, and costs.

**COUNTS III, IV, AND V---FRAUD, DECEIT, AND CONSTRUCTIVE FRAUD**

57.     Plaintiff and the Class incorporate by this reference the allegations in paragraphs 1-56.

58.     Defendants made uniform misrepresentations and/or omissions on the monthly check stubs sent to Class members reflecting the wrong volume and price, and not detailing all of the monetary fee and in-kind volumetric deductions.

59.     The source of the underpayments and deductions are gas marketing contracts that were negotiated and signed in Oklahoma, and accounting for the gas marketing contracts and royalties are done at Chesapeake's home office in Oklahoma.

60.     As set forth above, Defendants made a material representation that was false and/or omitted to state one or more material facts needed to make what was stated not misleading.  Defendants knew when the material representations were made on the check stubs

that they were false or misleading and/or at least made recklessly without any knowledge of their truth, or made them with the intent that Plaintiff and the Class would rely on them. Plaintiff and the Class did rely on and/or are legally presumed to have relied upon these uniform written representations as being truthful and accurate, when they were not, and Plaintiff and the Class members suffered injury and were underpaid as a result.

61.     Defendants also concealed or failed to disclose facts about the price, volume, value, various products produced, and deductions, which Defendants had a duty to disclose to avoid presenting half-truths or misrepresentations.

62.     Defendants undertook the duty to properly account by making the statements in the check stubs on a monthly basis to royalty owners. By speaking on the issue, Defendants had a duty to make full and fair disclosure of all relevant facts. This is especially so because Defendants had superior and/or specialized knowledge and/or access to information as compared to the royalty owners.

63.     Defendants knew that their representations or omissions on the monthly check stubs were at least ambiguous and created a false impression of the actual facts to the royalty owners.

64.     Defendants knew the facts were peculiarly within the Defendants' knowledge and that the royalty owners were not in a position to discover the facts pertaining to the proper volume, values, and constituents coming from their wells. Accordingly, having spoken on the subject matter, Defendants had a duty to make full and fair disclosure of all material facts such that their statements were not misleading, but they did not.

65.     Defendants was deceitful by suggesting, as a fact, that the volume, price, value, and other statements were as set forth on the check stubs monthly but which was not true and

Defendants knew the statements were not true, had no reasonable grounds for believing they were true, or gave only such information as was likely to mislead for want of the communication of the non-disclosed facts.

66.    The misrepresentations and omissions were intentionally made and were intended to suggest that the price was a third party commercial price without hidden deductions, the volumes were accurately measured without volumetric deductions, and that deductions would be shown on the check stub when in fact they were not.

67.    Defendants has fraudulently and deceitfully misled the Class into believing that they had been paid on the full value of the production from their wells by falsifying and creating misleading check stubs sent to the Class.

68.    Defendants acted intentionally or recklessly in disregard for the rights of Plaintiff and the Class members, on a uniform basis, by not properly paying royalty owners, by deceiving them with check stubs that were misleading, and by failing to correct Defendants' royalty payment practices after being sued multiple times for underpaying royalties such that punitive damages should be awarded and that Defendants acted intentionally and with malice toward Plaintiff and the Class members subjecting Defendants to punitive damages.

69.    As a direct and proximate result of Defendants' deceit and fraud, Plaintiff and the Class were underpaid monthly for royalties and are entitled to recover actual and punitive damages.

70.    In addition, the money wrongfully obtained by Defendants as a result of what should have been paid to Plaintiff and the Class should be held in constructive trust along with monetary interest for Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for an Order and Judgment against Defendants as follows:

a.      Certifying this action pursuant to (b)(3) as a class action, appointing Plaintiff as the class representatives, and Plaintiff's Counsel as class counsel with reasonable notice to be given to members of the Class;

b.      Awarding Plaintiff and the Class damages for actual damages for breach of lease, and interest at the highest allowable rate (such as lawful, equitable, or internal rate of return), as well as compensatory and punitive damages for breach of fiduciary duty, fraud, deceit, and constructive fraud;

c.      Granting Plaintiff and the Class the costs of prosecuting this action together with reasonable attorney's fees out of the recovery;

d.      Granting such other relief as this Court may deem just, equitable and proper.

## JURY DEMAND

Plaintiff and the Class demand trial by jury regarding all issues that can be tried to a jury under applicable law.

## ATTORNEYS' LIEN CLAIMED.

Rex A. Sharp OBA#011990
Rex A. Sharp, P.A.
5301 W. 75th Street
Prairie Village, KS  66208
(913) 901-0500
(913) 901-0419 fax
rsharp@midwest-law.com


Counsel for Plaintiff